King, J.
In this action certain creditors of the Toledo Display Horse Company, a corporation, are seeking to have distributed to them-, in payment of their claims, certain funds in the hands of a receiver, and to prevent the application of the funds to the payment, as a preferred claim, of the debt of the First National Bank of Toledo. The claim of the bank arises in this way: On the 22 June, 1894, the *290 corporation, known as the Toledo Horse Display Company, 'was doing business in Toledo, in the course of which they borrowed one thousand dollars of the First National Bank, and executed to the bank its promissory note for that sum, promising to repay the money in ninety days with interest at eight per cent, per annum. This note was executed upon its face by the president and secretary of the defendant company, in their official capacities, and at the same time the president and the secretary individually endorsed the note upon its back,' The money was procured and used by the corporation in its business and for its benefit. At the time the money was borrowed, these officers of the corporation promised or agreed with the bank that if required or asked for, they would give other and additional security upon the property of the concern; Nothing further, however, was done in reference to the loan at that time. The note matured on September 28th, or thereabouts, and the matter ran along and the corporation became indebted to the bank, not only for this note and interest accrued thereon, but also on a small over-draft, so that on the 22 November the debt amounted to 11060; and on this day — Nov. 22, 1894 — the corporation, by its president and its secretary, and under the seal of the corporation, executed to the bank a chattel mortgage upon all its property — at least all of its chattel property, and-there is no evidence before us that it had any other property except its chattel property — which consisted of its stock in trade and the materials which it had on hand, and which it was engaged to manufacturing into display horses, and perhaps other articles. This chattel mortgage on all of its property was executed and delivered to the bank, to secure a new note drawn up and executed on that day by the president and secretary of the corporation for the amount of its entire indebtedness to the bank, viz: 11060. This mortgage was held and not filed for a few days, but it was *291 filed with the recorder of Lucas county, Ohio, on Dec. 5, •1894, at 11:58 A. M. On the 4th of December the bank claimed that it took possession of this stock, by sending ■one of its clerks to its premises, and to him was delivered, by the president of the corporation, the key of the store room, in which most of the stock and material was located, and he held some-sort of possession of this store room from that time,during the following day, and until the forenoon of December 6th, when he surrendered possession of all the property which had been held for the bank,to a receiver that had been appointed in this action on December 5th. This action was commenced by' the president, Mr. Augustus F. Bosche, on that day, as he says, for the reason that he feared trouble from attachment proceedings which had been on that day commenced and were pending before a justice of the peace in this city. The Display Horse Company had become insolvent. . It was insolvent on the 22nd of November when it executed this chattel mortgage, and it remained in that condition and was insolvent on the day of the appointment of the receiver; but on the 22d November, at the time of the execution of this chattel mortgage, we do not find that the officers of the company expected to suspend business, but, on the contrary, they expected to continue business. We find that the mortgage was given to the bank for' the purpose of satisfying it, .for the time being, so that they would commence no legal proceedings against this company, but would permit them to have further time to go on with their business. They did expect to carry on business for an indefinite time in the future, and were continuing to carry it on up to the 5th of December, when, the president says, some cases were commenced against the company before a justice, and then he commenced this action to have a receiver take charge of the business,and wind it up.
The president and secretary executed this second note *292 and mortgage without any consultation or meeting with any of the other directors. There were five directors, of whom the president and the secretary were two; the president’s sister was one, and a Mr. Smith'and Mr. Chapman. Mr. Smith was, at the time of the execution of the chattel mortgage, travelling on the railroad somewhere, engaged in some business of his own, and was not in Toledo. He. returned here after the giving of the note and chattel mortgage, was notified of it and agreed to it, and never dissented from it. Mr. Chapman was in Toledo, but his attention was not called to it until after it was given, when he was notified of it, agreed to it, and never dissented from it. In his examination he is finally of the opinion that his attention was not called to it until after the appointment of the receiver, but he is not certain of this. As it has been three years ago, he is not at all certain that he learned of it before or after the appointment of the receiver, but he thinks he learned ,of it shortly after it was given. Mr. Chapman is not very clear in his recollection on some other matters. For instance, he thinks he never attended a meeting of the board of directors, while upon the record it appeared that he had attended two or three of them, back in May, 1896, and by the records of the corporation it does not appear that after the month of May the board of directors ever had a meeting — no record was kept of meetings after May, 1896. It is fair to say that so far as Chapman is concerned, after May, 1891, he never gave the business of the corporation any attention, but it was managed by its president and secretary and Mr. Smith, who, when he was in Toledo, was consulted. Miss Bosche does not appear to have taken any active interest in the concern, but was nominally a director,having no management of it whatever, and, so far as the proof shows, she never was consulted about any of its business.
It is claimed here, that this mortgage should be held— *293 in the interest of the general creditors — void, for the reason that it was given in fraud of creditors, or was a preference made by this corporation which was actually insolvent and, that within the law as laid down in 46 Ohio St., it is absolutely void.
Upon that point, I may say that we do not think it comes within the doctrine as laid down in 46 Ohio St. It is substantially, in its facts and law, like the case of Campbell v Bellman Bros, reported in 11 Circuit Court Keports, 360, which sustained as valid the conveyance there involved, and is within the doctrine as laid down in 47 Ohio St 581.
But is it void, because it was not legally executed by its board of directors, or by any board of directors? An able argument is made here as to the powers and duties of the directors of a corporation, as to the necessity of their meeting and transacting their business as a whole body; that the minds of the directors should come together, and that their assents should be given to any corporation acts, or to any that are necessary for its board of directors to perform as distinguished from those of the executive officers —the president, treasurer and secretary. In most all of the authorities the reasoning'is applicable to a case where a threat of injury is made, or where the stockholders or non-attending directors are complaining that the business of the corporation has not been properly 'attended to by their agents and, no doubt, any stockholder may well object to the violation of duty on the part of his agent in the management of the business of the corporation whenever he is given an opportunity for that purpose. Or he may bring an action to have those who violate their duties as officers removed from office. And so may a state bring an action to oust a corporation from its franchises as a corporation for the violation of its legal duties; but none of them, so far as I can ascertain, is applicable to this case, which is *294 a mere contest between creditors claiming priority of payment out of the assets of a -corporation. Persons dealing with officers of a corporation are only bound to know the legal power of the corporation to perform, acts; they are not required to know that all the formalities required of the different officers in the performance of their duties have been observed. There is a clear and a wide distinction between those two propositions. A corporation in Ohio has a right to borrow money to pay its debts and' to run its business, and it has a right to give a mortgage upon all the property it possesses, to secure that loan. It is necessary that the creditor should know that the corporation has the power to make a loan and to secure it by mortgage; but if satisfied himself of that authority, it is not the business of the creditor that he should know that the board of directors has had a meeting, and that it has passed a formal resolution that they are to borrow money or give security therefor, or that the directors’have been legally elected, or that the directors took an active interest or not. The creditor is not bound to know those things. He is dealing with a corporation, which is a legal entity which the state has invested with the right to do things in its corporate name, through its officers, and throught its officers alone. This doctrine is abundantly supported by authority, and I will cite two or three of the leading ones upon the subject. The case of The Miners’ Ditch Co. v. Zellerbach and Powers, found in 37 California Repts. 543, is a leading case. I will read from the syllabus, as the opinion is of great length:
“In a contract between a corporation and strangers dealing with it, when the act in question is one which the corporation has no power to perform under any circumstances, the corporation may avail itself of the defense of ultra vires; but when the act may be performed by the corporation for some purposes, but not for others, the defense of ultra vires may or may not be available. If the stranger dealing with the corporation knew of its intention to pe'rform the act for *295 an unauthorized purpose, the defense 'is available, otherwise not.
“Where a deed purporting to be the deed of a corporation is signed by its trustees as trustees, and has the corporate seal affixed, it is admissible in evidence as a deed of the corporation, and is itself prima facie evidence of the regular and duly authorized execution of the same.”
That is an interesting case. There is also a leading case found in 88 Eng. Com. Law Rep. 337, in which the question is discussed.
This authority in 26 Ohio St. 426, is in line with that as to the effect of a deed only:
“A deed executed by the president of a railroad company in due form, under the seal of the corporation, and delivered, will be presumed to have been authorized by the directors; and the mere fact that such authority is not found on their minutes will not rebut the presumption.”
In 5 Thompson on Corporations, under secs. 597 and 598, many authorities will be found. Now it is clear from these authorities, that this corporation could not defend against a suit brought by the bank on the ground that it did not have the authority to make this loan, because the corporation did have authority to make it and to secure a loan made for business purposes, and the creditor is not bound to inquire into the purpose. If he has a full and distinct knowledge of what the purposes are, and if they are illegal, it might make a defense, otherwise not. But here the loan was entirely proper — was made for the uses of the corporation, and was borrowed by the officers of the company upon the distinct promise that they would individually endorse it. They were not required to endorse the company’s paper. It was without consideration moving to them. They could, by their own acts and the consent of the bank, change that endorsement at any time they saw fit, or change to any other form of security. The loan was made to the corporation,and the corporation was bound *296 to secure it, if security was to be given; but there was no obligation, implied or otherwise, resting upon them that they should maintain the contract in the form in which it was originally made. The corporation having power to borrow money and to give security, the executive officers; could change the form of security whenever they saw fit, and whether they did that with or without a meeting of the board of directors, is a matter of no consequence, and the security cannot be taken from the bank because the board of directors did not meet. But, as a matter of fact, every director who knew anything about it, agreed to this mortgage — 'Consented to it. Shall it be held then that the general creditors may come in and set aside this mortgage which was given in good faith? It would be very bard to hold that to be law, and we think the bank should be entitled to this money; provided, however, that the receiver shall pay all the costs of this action before he distributes the proceeds of this property, and he can then pay the bank its claim so far as the proceeds go.
I. N. Huntsberger, for Plaintiff
Johnson. Thurston, Wesley J. Thurston, E. W. Tolerton, for Defendants.